In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 18-2634 & 18-3129

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CHRISTOPHER DAVIS and MAURICE GREER,

*Defendants-Appellants.*

Appeals from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:15-cr-00184-SEB-MJD — **Sarah Evans Barker**, *Judge.*

ARGUED DECEMBER 3, 2019 — DECIDED MARCH 20, 2020

Before WOOD, *Chief Judge*, and HAMILTON and SCUDDER,
*Circuit Judges.*

WOOD, *Chief Judge*. Christopher Davis and Maurice Greer
were charged with robbing two different Walmarts in Indiana
over a four-month period. A jury convicted both of them, and
they now challenge the sufficiency of the evidence underlying
their convictions. Because a rational jury could have found
each one guilty beyond a reasonable doubt, we affirm.

**I**

According to the government's evidence at trial, Davis met Deidre Orkman, an assistant manager at an Indianapolis Walmart, in early 2015 while he was shopping at the store. The pair soon began dating. During the course of their relationship, Orkman often discussed her job with Davis, and she revealed to Davis what she knew about Walmart's policies and procedures for handling cash. Armed with this inside information, Davis hatched a plan to rob the Indianapolis Walmart with two of his cousins—Greer and Darryl Williams.

Before the first robbery, Orkman met with Davis and Greer to discuss logistics. She told Davis and Greer that a Sunday night or Monday morning would be the best time to rob the store because a large amount of cash from the weekend would remain on hand. Davis and Greer took Orkman's advice. On the morning of Monday, June 8, 2015, the two dropped Orkman off at the Indianapolis Walmart for her morning shift. Amanda Greene and Jana West were working alongside Orkman that morning at the store's customer service area.

Orkman, Greene, and West testified about the following events, most of which were also captured on security cameras. Greer, who had been lurking behind the sunglasses rack, entered the customer service area and pointed a gun at West and Orkman. They then proceeded to the cash room, and Greene (who was already in the cash room) and Orkman started loading cash into bags. West was crying and shaking in fear. Once the cash was in the bags, Greer used duct tape to restrain West, Greene, and Orkman. Greer then left the Walmart with the bags of cash and returned to the car where Davis was waiting. Hours later, Davis took photographs of a large amount of

cash spread on a table, and Davis gave Orkman $1,500 for her role in the robbery.

Apparently satisfied that the Indianapolis Walmart was a good target, Davis soon decided to rob it again. He discussed his plans with Williams (his cousin and Greer's brother) and Orkman. Orkman originally was "okay with it," but later told Davis that she wanted out. Davis informed Orkman that the robbers would kill her if she told anyone. Davis and Williams then moved forward with their plans for the second robbery.

Williams testified about the details of the second robbery. Orkman was working the overnight shift from August 27–28, 2015. Davis drove Williams to the Indianapolis Walmart and gave him a gun to use during the robbery. Williams entered the store and hid inside the restroom before calling Davis. Next, Davis called Orkman to see if she was working at the front of the store. Orkman testified that she received a phone call from Davis, who told her to "[g]et ready," which she understood to mean that the robbery was about to take place.

Williams left the bathroom, found Orkman, showed her the handgun, and demanded that Orkman take him to the cash room. Orkman testified that she thought she would be shot if she did not comply. Security video captured the following events. Just after midnight on August 28, Orkman and Williams entered the cash room, and Williams gathered cash from the counter. Orkman opened the safe and removed bundles of cash, which Williams placed into his bags. Williams then restrained Orkman's hands with zip ties and bound Orkman's mouth with duct tape. Williams walked out of the store and went to a nearby apartment parking lot where Davis was waiting.

Later that day, Davis paid $8,000 in cash for a white Land Rover, which he purchased from a used car dealership. The car dealer testified that the cash was in low-denomination bills, principally $5 and $20. The Indianapolis Metropolitan Police Department ("IMPD") suspected that the June 8 and August 28 robberies were related, and Orkman was a person of interest because she had worked during both of the robberies even though they occurred during different shifts. While conducting surveillance on Orkman, an IMPD officer noticed Davis's Land Rover parked outside of Orkman's apartment. The officer learned that the Land Rover had been purchased on August 28—the same day as the second robbery—and obtained a court order to place a GPS tracking device on it.

Soon after, Davis began planning for yet another Walmart robbery, this time at a store in Kokomo, Indiana. Davis recruited his friend, Tyrone Townsell, by telling him about the June 8 robbery. Townsell testified about the following events. On the night of September 13, 2015, Davis and Greer picked up Townsell in Indianapolis, and the trio, with Davis driving the GPS-tracked Land Rover, drove north to Kokomo. Greer and Townsell entered the store around midnight but left after noticing that it was still full of customers. A few hours later, Greer and Townsell entered the store a second time, after 3:00 a.m. on September 14, while employees Lucy Bishop and Tom Johnson were working.

Bishop, Johnson, and Townsell added the following details, most of which were also captured on video. Greer held a gun up to Johnson, and after Bishop approached, Greer told Johnson and Bishop to stay quiet. Bishop unlocked the cash room, and Greer and Townsell followed the employees

inside. Greer and Townsell ordered Johnson to open a safe and load cash into a suitcase inside a shopping cart; he complied. Greer also grabbed bundles of cash. Greer displayed the handgun to Johnson and Bishop and made them kneel in the back room, where he restrained them with duct tape and zip ties. Townsell carried the cash out of the store in the suitcase, with Greer following close behind. They returned to Davis's Land Rover and drove back to Indianapolis via back roads in the hope of avoiding any police officers. The trio went to Davis's apartment, and Greer took photographs of the cash sitting on the table in the apartment. The photographs were ultimately retrieved from Greer's phone.

The GPS tracking device allowed the IMPD to pinpoint the location of the Land Rover after the department received an alert about the Kokomo Walmart robbery. Officers arrested Davis, Greer, and Townsell during a traffic stop in Indianapolis. Inside Davis's Land Rover, law enforcement found a gun, two stashes of cash ($23,862 and $9,088) in a green bag in the cargo area, and $17,020 in a bag on the front passenger floorboard. At the time of the arrest, Greer had $8,205 in his pocket and Davis had $1,958 in his.

The police also executed a search warrant for Davis's apartment. They found a bag of quarters stamped "Walmart 5804," which was the unique store number of the Indianapolis Walmart. Officers also found ammunition, additional cash, and the suitcase taken from the Kokomo Walmart; that suitcase still had the Walmart store tag attached to it. The FBI determined that the robbers had stolen, in total, about $225,000 from the Walmart stores.

The government eventually obtained a third superseding indictment against Davis, Greer, Williams, Townsell, and

Orkman. With respect to Davis and Greer, the government charged the following:

| Count | Violated Statute – 18 U.S.C. | Robbery Date | Robbery Location | Defendant |
|-------|------------------------------|--------------|------------------|-----------|
| 1 | § 1951 | 6/8/15 | Indianapolis | Davis, Greer |
| 2 | § 924(c) | 6/8/15 | Indianapolis | Davis, Greer |
| 3 | § 1951 | 8/28/15 | Indianapolis | Davis |
| 4 | § 924(c) | 8/28/15 | Indianapolis | Davis |
| 5 | § 1951 | 9/14/15 | Kokomo | Davis, Greer |
| 6 | § 924(c) | 9/14/15 | Kokomo | Davis, Greer |
| 7 | § 922(g) | 9/14/15 | Kokomo | Greer |
| 8 | § 1951(a) | 6/8/15 – 9/15/15 | Indiana | Davis, Greer |

Davis and Greer proceeded to a jury trial, and the jury found each man guilty on all counts as charged. The district court denied Davis's and Greer's Rule 29 motions for judgment of acquittal, finding that sufficient evidence was presented at trial to sustain each of the charged offenses.

## II

We review a trial court's ruling on a Rule 29 motion *de novo*, asking only "whether evidence exists from which any rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt." *United States v. Doody*, 600 F.3d 752, 754 (7th Cir. 2010). "Reversal under this

standard is rare because we defer heavily to the jury's findings and review evidence in the light most favorable to the government." *United States v. Johnson*, 874 F.3d 990, 998 (7th Cir. 2017). We will reverse only when no rational trier of fact could have found the defendant guilty. *Id.*

## A

Davis contends that there was insufficient evidence for his convictions on Counts 1, 3, and 4. We start with Count 1, which charges Davis with interference with interstate commerce by robbery, in violation of 18 U.S.C. § 1951, in connection with the June 8 robbery of the Indianapolis Walmart. Davis argues that the evidence at trial failed to link him to the June 8 robbery. He asserts that the government did not offer any testimony from any witnesses of the robbery that established his presence at the Indianapolis Walmart on June 8. Moreover, he was never identified as a person who entered the Walmart and held up the employees in exchange for money.

Davis, however, was charged with all three Walmart robberies as an aider and abettor. See 18 U.S.C. § 2(a). Aiding and abetting requires that a person (1) act in furtherance of the offense (2) with the intent to help the offense's commission. *United States v. Rivera*, 901 F.3d 896, 901 (7th Cir. 2018). The government is not required to prove that the defendant assisted every element of the underlying offense. *United States v. Woods*, 148 F.3d 843, 850 (7th Cir. 1998). Instead, it must show only that the defendant "contributed at least one act of affirmative assistance." *Id.*

Although Davis might not have physically entered the Walmart during the robbery, the government provided ample

evidence that he affirmatively assisted in at least one way.
Orkman testified that Davis was the getaway driver for the
June 8 robbery, and Davis also drove Orkman and Greer to
the store. When an armed robbery defendant acts with
knowledge, "merely transporting the robber and the firearm
to the scene of the crime amounts to facilitation sufficient to
support the jury verdict." *Id.* at 848.

Other evidence also supports the jury's determination that
Davis participated in robbing the Indianapolis Walmart on
June 8. Location data from Davis's phone placed him near the
Indianapolis Walmart around the time of the robbery. Photo-
graphs were recovered from Davis's phone, including some
from June 8 depicting a large amount of cash spread on his
living room table. Orkman testified that Davis gave her $1,500
for her role in the June 8 robbery. Moreover, when Davis's
apartment was searched, the bag of quarters recovered was
stamped "Walmart 5804," which was the unique store num-
ber of the Indianapolis Walmart. Although the bag of quarters
could have been stolen during the second Indianapolis
Walmart robbery, the "jury did not need to look at the evi-
dence for each robbery 'in isolation from the others.'" *Rivera*,
901 F.3d at 901. It could consider evidence of Davis's actions
during the other robberies to infer reasonably that Davis par-
ticipated in the June 8 robbery. *Id.* A reasonable jury could
conclude, as this jury did, that Davis was guilty beyond a rea-
sonable doubt on Count 1.

We now turn to Counts 3 and 4. Count 3 charged Davis
with interference with interstate commerce by robbery, in vi-
olation of 18 U.S.C. § 1951. Count 4 charged Davis with using,
carrying, or brandishing a firearm during a crime of violence,

in violation of 18 U.S.C. § 924(c). Both counts refer to the August 28 robbery of the Indianapolis Walmart.

Davis's argument for Count 3 focuses on the statutory definition of robbery. Section 1951 defines robbery as "the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession … ." 18 U.S.C. § 1951(b)(1). Davis argues that the government's evidence did not show that "actual or threatened force" was used during the August 28 robbery.

His argument rests on Orkman's advance knowledge of the robbery, because she was the only Walmart employee present at the time of the robbery. Davis claims that the video evidence shows Orkman looking relaxed as she helped Williams gather cash from the safe. Davis highlights that Williams was also relaxed, even setting down his gun as he was collecting and bundling the money. Because Orkman showed no fear during the robbery and Williams was relaxed, Davis argues, Orkman was a co-conspirator and the government did not provide sufficient evidence of "actual or threatened force" for the conviction on Count 3.

The jury, however, reasonably drew a different inference from Williams's and Orkman's testimony. Williams testified that when he pulled a gun on Orkman, it was a threat. Orkman also testified that she thought Williams would shoot her if she did not comply with his demands. In addition, before the August 28 robbery, Orkman told Davis that she no longer wanted to be involved in future robberies, and Davis told her that if she said anything, "they will kill you." This evidence

contradicts Davis's assertion that Orkman was a "relaxed" co-conspirator. Whether or not Orkman was a co-conspirator in the August 28 heist, there was ample testimony supporting a finding that she feared injury during the robbery and that her fear was reasonable. See *United States v. Mitov*, 460 F.3d 901, 907 (7th Cir. 2006) (stating that a fear of economic harm need only be reasonable for Hobbs Act extortion). We see no reason to disturb the jury's conclusion on Count 3.

Count 3 served as the predicate offense to convict Davis on Count 4. Davis argues that since there was insufficient evidence to sustain his Count 3 conviction, we should vacate his conviction on Count 4. Because we find that sufficient evidence supports Davis's conviction on Count 3, we also affirm the jury's verdict on Count 4.

B

We now turn to Greer. Greer argues that the government presented insufficient evidence for his convictions on Counts 1 and 5. Both counts charge Greer with interference with interstate commerce by robbery, in violation of 18 U.S.C. § 1951. Count 1 refers to the June 8 robbery of the Indianapolis Walmart, and Count 5 refers to the September 14 robbery of the Kokomo Walmart.

Greer contends that his brother, Williams, was responsible for both robberies. He claims that Williams was therefore motivated to blame anyone else and lied during his testimony. Because of the similarities in their height and complexion, Greer claims that he was an easy target for that blame. Moreover, Greer argues, Williams faced a life sentence if he failed to cooperate, so he could not be a reliable witness.

Williams, however, was not the only witness to identify Greer. Greer's co-conspirators also testified against him. Orkman identified Greer as the gunman in the June 8 robbery, and Townsell identified Greer as the gunman in the September 14 robbery. Greer claims that his co-conspirators' identifications are also not persuasive because of their plea agreements, but Greer forgets about the Walmart employees who testified. Greene, an employee at the Indianapolis Walmart when it was robbed, testified that Greer was the gunman in the June 8 robbery, and Johnson, an employee at the Kokomo Walmart when it was robbed, testified that Greer was a robber in the September 14 robbery. "It is the jury's job, and not ours, to gauge the credibility of the witnesses and decide what inferences to draw from the evidence." *United States v. Stevenson*, 680 F.3d 854, 857 (7th Cir. 2012). "We do not second guess such determinations on appeal." *Id.* The jury believed that Greer, and not Williams, was the gunman in both robberies, and we will not question that decision.

Furthermore, the eyewitness identifications are not the only evidence supporting Greer's conviction. The jury saw the surveillance videos of the June 8 and September 14 robberies, and although details of the perpetrators' faces were not entirely clear, the jury was entitled to find that each video corroborated the identifications. In addition, for the September 14 robbery, location data from Greer's phone placed him in the vicinity of the Kokomo Walmart at the time of the crime. Greer also photographed large amounts of cash after the September 14 robbery, and these photographs were recovered from his phone. Moreover, when the Land Rover was stopped, Greer had $8,205 in his pocket, and a bag of $17,020 was at the floor of the front passenger seat where he had been sitting. Based on this corroborating evidence, the jury was

entitled to conclude that Greer was guilty beyond a reasonable doubt on Counts 1 and 5.

We therefore AFFIRM the judgments of the district court.